UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE, WESTERN DIVISION

| | |
|---|---|
| **KIRSTEN WILLIAMS** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**AT&T MOBILITY SERVICES, LLC.,** )<br>)<br>Defendant. )<br>) | Docket No: _____<br><br>**JURY DEMAND** |

## COMPLAINT

Plaintiff Kirsten Williams ("Plaintiff"), by and through undersigned counsel, files this Complaint against AT&T Mobility Services, LLC ("Defendant"), and alleges as follows:

### I.  INTRODUCTION

1. This is a civil action to make whole the Plaintiff after denial and interference with the attempted exercise of her rights guaranteed by the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADAAA"), including the right to be reasonably accommodated and not to be discriminated against, on account of Plaintiff's specific disability; Defendant's act(s) also constitute unlawful retaliation against Plaintiff, also in violation of the ADAAA.

### II.  PARTIES

2. Plaintiff, at all times relevant to this Complaint, resided in Southaven, DeSoto County, Mississippi.

3. Defendant AT&T Mobility Services, LLC is a commercial entity, incorporated in the State of Delaware, and with its principal corporate address in Atlanta, Georgia. Defendant

1

regularly does business in the Memphis, Tennessee area, where it employs 500 or more persons in said area.

### III.  JURISDICTION AND VENUE

4.	Plaintiff brings this action pursuant to 28 U.S.C. § 1331, under the original jurisdiction of this Honorable Court over this private suit to enforce federal civil rights and employment law protections.

5.	Venue is proper in the U.S. District Court for the Western District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2), because the unlawful employment practices occurred within Shelby County, Tennessee, where Plaintiff formerly worked, where Plaintiff suffered the unlawful employment practices and the resultant damages, and where Plaintiff would be employed by Defendant in the absence of unlawful employment practices.

### IV.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.	Plaintiff has met all procedural requirements for filing this Complaint including administrative exhaustion required for jurisdiction in this Court.

7.	Plaintiff filed two separate charges of discrimination with the Equal Employment Opportunity Commission, and did so within 300 days of the actions complained of. Plaintiff filed her charge for violations related to the ADAAA throughout 2014, she received her right to sue notice(s) from the Equal Employment Opportunity Commission on December 10, 2014. **See Exhibit A, "Right to Sue Letter" against Defendant (Claim No.: 490-2014-02103).** Accordingly, this lawsuit is timely filed, within ninety (90) days of said notice.

### V.  STATEMENT OF FACTS

8.	Defendant regularly does business in the Memphis, Tennessee area, and employs 500 or more persons in said area.

9.      Plaintiff was hired at AT&T Mobility Systems on August 21, 2006 as a Customer Service Representative. She answered inbound calls and assisted with technical support at Defendant's call-center.

10.     Plaintiff's work schedule changed every six (6) months. At the time of Plaintiff's termination on July 3, 2014, there were around twenty (20) work schedules operated by Defendant over the course of seven (7) days a week.

11.     During the winter of 2007, Plaintiff began suffering from issues related to major depression disorder and an inability to maintain prolonged concentration. As a result, Plaintiff was restricted from work for two (2) weeks and was referred back to Dr. Audria Black for a mental health evaluation. Dr. Black diagnosed Plaintiff with major depression.

12.     In early 2008, as a result of depression and attention deficit problems, Plaintiff found it increasingly difficult to stay focused at work. Specifically, she found multitasking very difficult, and the symptoms of her depression became steadily worse. She began experiencing greater anxiety, nervous issues, and confusion. She also became withdrawn from daily activities and her family, and started to miss more work due to the side-effects of the related prescribed medication for depression.

13.     In the winter of 2008, Plaintiff began consulting a Psychiatrist and other medical doctors for mental health care. She received care at the *Hutchison Clinic* in Memphis TN, from Dr Ying Xu. Plaintiff was treated by Dr. Xu for migraines, depression and pityriasis rosea, due to stress and nervousness.

14.     In the Spring of 2009, Plaintiff changed medical doctors and started receiving medical and mental health care from Southwind Medical Specialists ("SMS"). Plaintiff was then referred by SMS to *Mental Health Resources* for an Intensive Outpatient Program (IOP), and began to

consult with Psychiatrist, Dr. Akin. As a result, Plaintiff was prescribed a changed course of antidepressants.

15. In May of 2009, Plaintiff attempted several times to have her work schedule from Defendant altered to better accommodate her depression and mental health issues. However, the work schedules were based on a seniority system and Plaintiff was left with no option to change her work schedule so as to accommodate her mental health problems. The only change permitted by Defendant was to alter Plaintiff's schedule for about three (3) weeks. However, thereafter, the schedule change occurred due to Defendant's policy to change the schedules every six (6) months.

16. In 2010, Plaintiff expressed to her Psychiatrist, Dr. Akin that her symptoms were not improving. She was still taking Prozac, and was prescribed Zoloft. However, after three (3) weeks of using Zoloft, Plaintiff encountered difficulty staying awake throughout the day. As a result, Plaintiff received medical leave from Defendant of about fourteen (14) days for medicine management (to assist in her transition away from using Zoloft and Prozac). Plaintiff was also, referred back to *Mental Health Resources*.

17. In 2011, Plaintiff was prescribed Effexor (an anti-depressant) by Dr. Akin, based at HealthQuest.

18. In the summer of 2012, Plaintiff believed, with advice from Dr. Akin, that she was able to stop taking her antidepressants. However, as a result of stopping this medication, she began to suffer from memory problems, such as forgetting passwords, and grew confused by Defendant's newly implemented customer service technical procedures. Without her medications, she also began to lose concentration during calls to customers and confused references over accounts from previous calls.

19. As a result of the aforementioned problems, Plaintiff advised her Team Manager, Evelyn Malone that she needed to be trained on updated systems and software. She also made known her difficulty coping with the monitors (which were suffering ongoing technical problems) and in concluding a call in less than five (5) minutes (the expected time by Defendant was three (3) to five (5) minutes). She advised Team Manager Evelyn Malone that she valued and needed her job, and requested that Area Manager Darcus Payne give her more time to adjust to the updated systems because of her depression and anxiety. Plaintiff was coached on how to do her job more efficiently, but was never re-trained as she requested.

20. In late 2012 and early 2013, Plaintiff requested a workplace accommodation due to her depression, anxiety and memory loss. However, her new Team Manager, Djuna McClung, continued to harass her about trying to get her paperwork processed faster. At this time, due to her depression and anxiety, Plaintiff also had difficulty trying to stay within scheduled breaks and lunches. She also found it difficult to log-in at the beginning of her shift and end her shifts on time due to forgetting to log-in, and difficulty remembering her user ID, and passwords. Further, at the time, Customer Service Representatives like Plaintiff were required to use over fifteen (15) different passwords, and those would usually automatically expire after ninety (90) days.

21. In early 2013, Plaintiff filed EEOC Charges against AT&T Mobility for discrimination under the ADA, religion and retaliation, based primarily on Team Manager McClung's treatment of her, and McClung's tolerance of open mockery of Plaintiff's disability by co-workers. Due to Plaintiff's depression, in part aggravated by her work situation, she did not pursue these claims.

22. Due to her referenced mental impairments, Plaintiff's call handling times became higher than the average time expected by Defendant. For example, sometimes she would take up to

5

thirty (30) minutes to resolve certain customer issues. As a consequence, these calls would often roll-over into her lunch and break times. This led to discipline by Team Manager McClung. Plaintiff, however, continued to update and advise Area Manager Payne of her mental impairments and the side-effects of her medications because of a stressful working relationship with McClung and McClung's inappropriate open verbal mockery of Plaintiff's mental impairments.

23.     During this same period, Plaintiff would request assistance with a call, but Team Manager McClung would refuse to help her. Further, McClung chastised Plaintiff that if she could not keep up with Defendant's technology then this was no longer the job for her. McClung continued to harass Plaintiff about how her medical needs affected her work. Specifically, in late 2012 and early 2013, McClung began making provocative statements such as, "[Plaintiff] needed JESUS to rid [her] of demons." Also, McClung would tell Plaintiff aloud in the Call-Center, surrounded by co-workers, *to get her pills out if she could not get her mind together*. Accordingly, in about March 2013, the work environment became so hostile that Plaintiff requested to be transferred to work under a different management team. As a result, Defendant allowed Plaintiff to work away from McClung, but Plaintiff was still made to keep reporting to McClung and to work the same schedule. Further, Plaintiff also made several reports with Defendant's ethics hotline about McClung and the manner in which that she was being treated.

24.     In March 2013, Plaintiff contacted legal assistance to have her request for a workplace accommodation acknowledged. Specifically, on March 28, 2013, Defendant was mailed a letter from Plaintiff's counsel to request unpaid leave, as a reasonable accommodation, because of Plaintiff's mental health impairments and the hostile treatment suffered from McClung. However, on April 4, 2013, Defendant replied it would not accept the letter as a formal letter of

representation from Plaintiff's attorney. Rather, that letter states that "AT&T IDSC Quality Unit" would need a *Release of Information*, signed by Plaintiff, and a *Letter of Representation* - "indicating you are representing the employee on the referenced short term disability claim" before Plaintiff's attorney could be authorized to handle Plaintiff's short term disability claim. On April 10, 2013, Plaintiff's attorney responded with a second letter to Defendant's *Call-Center Absence Manager* to request that the correspondence dated March 28, 2013, be forwarded to Defendant's legal department so a reasonable accommodation could be discussed under the ADAAA.

25. Throughout April and May, 2013, Plaintiff twice voluntarily admitted herself to inpatient care at Lakeside Behavioral Health System, and later St. Francis Hospital. She was also involuntarily admitted one time to Lakeside. In short, Plaintiff suffered a mental breakdown, which included anxiety attacks, short-term memory loss, nerve damage, weight loss, flare ups of fibromyalgia, confusion, depression and repeated cycles of psychosis. Further, each time Plaintiff was released from care, problems arose due to her adjustment, or lack thereof, to her medications and resultant side effects.

26. On May 23, 2013, Plaintiff's attorney received a letter from in-house counsel for AT&T Services, Inc., acknowledging a previous conversation about Plaintiff's request for a reasonable accommodation based on her mental impairments. Defendant's in-house counsel informed Plaintiff's attorney that AT&T Integrated Disability Service Center ("AT&T IDSC") would need to medically clarify Plaintiff's requests and then would advise the requesting employee's management team. On May 28, 2013, Plaintiff's attorney replied to in-house counsel for AT&T Services, Inc., and informed him Plaintiff was currently too emotionally overwhelmed and mentally limited by her depression and anxiety to engage in an in-person or telephone

7

conversation with management at Defendant's Call-Center. However, Plaintiff asked to correspond in writing because she felt better able to formulate responses that would prove more helpful to Defendant in formulating a reasonable accommodation under the ADAAA. The letter also welcomed an opportunity for Plaintiff to sign an Authorization for Release of Medical Records, so as to make the process more expedient for Defendant and its investigation.

27. Plaintiff was on leave from work between February 2013 and the end of July 2013.

28. From May 2013 until about August 2013, Plaintiff remained in the care of her mother, with her mental impairments leaving her unable to make basic decisions about her life or people around her. As a result of her mental impairment(s), Plaintiff was also unable to have all requested medical paperwork for AT&T IDSC,[1] and, United Health Care,[2] submitted within twenty-four (24) hours of each event/treatment that required insurance coverage approval.

29. In June 2013, it was confirmed through a full psychological evaluation by Dr. Russell Crouse at *Germantown Psychological Associates* that Plaintiff had an additional diagnosis of Attention Deficit Hyperactivity Disorder (ADHD). As a result, she was prescribed Adderall. This medication proved helpful to her ADHD. By the end of July of 2013, Plaintiff's confusion problems were mostly gone. However, Plaintiff continued to suffer emotional and mental health problems related to depression and anxiety.

30. In August of 2013, Plaintiff was again referred to an Intensive Outpatient Program (IOP) for coping skills, but felt that she was able to return to work. In September of 2013, Plaintiff began using her vacation time to receive therapy for her mental impairment. She used her vacation time because she had exhausted all her FMLA leave-time and/or short-term disability leave. She continued treatment with IOP, and around this time Defendant permitted her a part-

---

[1] AT&T IDSC handled both short term disability and workplace accommodations for Defendant.
[2] United Health Care was the medical insurance provider for Defendant.

time work schedule for about four (4) weeks. She then transitioned back to a full-time work schedule, despite continuing to suffer from major problems related to her anxiety, depression and mood disorder.

31. Plaintiff's request for FMLA was denied on March 19, 2014, because Defendant claimed Plaintiff was ineligible in 2014, based on the fact she had not yet worked 1250 hours. Plaintiff's request for FMLA was based on her clinical depression.

32. As stated above, Plaintiff's mental impairments began to worsen in early 2014. However, Plaintiff still continued to work a regular schedule as best she could. On or about April 10, 2014, Plaintiff visited a Family Nurse Practitioner (FNP), Dr. Laura Thompson at *Primary Care Specialists, Inc*. for depressive disorder, fatigue, attention deficit disorder and anxiety disorder. The details of Plaintiff's April 10, 2014 treatment were provided to AT&T IDSC via its *Initial Physician Statement* form, completed by Dr. Thompson. As a result, Plaintiff was restricted from work from April 11, 2014 to April 27, 2014.

33. On April 17, 2014, Plaintiff was evaluated by Dr. Laura Thompson again for progress and referral. Plaintiff also gave her FNP Job Accommodations paperwork to Dr. Thompson, for it to be completed within fourteen (14) days, as required by Defendant. Plaintiff's Job Accommodations request identified the frequency of her limitations as twenty-five (25) hours per month for the next four (4) to six (6) months (from February 15, 2014 to August 15, 2014) for the purpose of assisting with her mental health care needs and recovery. This accommodation would also cover previous work days missed by Plaintiff due to her mental impairments. As requested by Defendant, Plaintiff also signed an *Authorization For Release of Protected Health Information* to AT&T IDSC. On April 23, 2014, Plaintiff completed and faxed the requested paperwork to AT&T IDSC Job Accommodations Department, specifically stating therein her

request for a more flexible work schedule, leave for six (6) months, and a modified break schedule based on her major depression and anxiety attacks. The due date for this paperwork was April 25, 2014.

34. On May 1, 2014, Plaintiff was admitted to *Psycamore Partial* IOP program for recurrent severe depression. She remained under its care for six (6) to eight (8) weeks.

35. On May 5, 2014, Plaintiff received a letter from her Call-Center Absence Manager, stating: "*In order to remain employed by [Defendant], you are required to return to work on or before May 12, 2014. If you believe you are unable to return to work by May 12, 2014 then by your return to work date you must*:" (sic) contact at least one of three listed contacts.  As a result of this letter, on May 6 or 7, 2014, Plaintiff contacted her Call-Center Absence Manager at Defendant's call-center and informed her she was still under a doctor's care and the requested paperwork would be sent to AT&T IDSC.

36. On May 7, 2014, Sedgwick CMS[3] was faxed an *Initial Physician Statement* by Psycamore Partial Hospital/IOP Programs, largely restating Plaintiff's medical problems as previously reported to AT&T IDSC via its *Initial Physician Statement* form on or about April 10, 2014. The paperwork projected treatment for Plaintiff was expected to result in improvement of Plaintiff's cognitive functioning within six (6) to eight (8) weeks. On May 8, 2014, Plaintiff also ensured that these same documents were faxed to AT&T IDSC.

37. On May 15, 2014, Plaintiff visited her Family Nurse Practitioner due to AT&T IDSC's request for updated medical documentation for April 28th through April 30th, 2014. In that paperwork, Dr. Thompson projected Plaintiff's medical leave would need to be extended until June 8, 2014. On May 15, 2014, this paperwork was faxed to AT&T IDSC by Plaintiff.

38. Plaintiff was discharged from Psycamore IOP on May 22, 2014.

---

[3] Sedgwick CMS facilitate the short term disability claims/payouts for AT&T IDSC

39. On June 2, 2014, a *Mental Health Statement* was provided to AT&T IDSC via Sedgwick CMS by Debra Butler at HealthQuest, where Plaintiff was still receiving outpatient care for her depression, mood disorder, and anxiety.

40. On June 12, 2014, AT&T IDSC denied Plaintiff's claim for disability benefits. However, it acknowledged its receipt of the information provided by Debra Butler at HealthQuest on June 11, 2014, as referenced in paragraph 39 above, herein.

41. On June 23, 2014, Plaintiff received a letter from her Call-Center Absence Manager, stating: "*In order to remain employed by [Defendant], you are required to return to work on or before June 30, 2014. If you believe you are unable to return to work by June 30, 2014 then by your return to work date you must*:" (sic) contact at least one of three listed contacts. As a result, Plaintiff telephoned her Call-Center Absence Manager to reiterate the current circumstances of her absence and mental impairments. Further, on June 27, 2014, Plaintiff appealed the denial of disability benefits, which was acknowledged by AT&T IDSC, and was informed a decision would be rendered to her by August 10, 2014. In the meantime, Plaintiff continued to suffer from major depressive disorder, anxiety and other mental impairments known to and documented by Defendant.

42. By June 27, 2014, despite numerous medical documentation provided to Defendant and its agents designated to handle short term disability leave <u>and</u> job accommodations; Plaintiff's signed authorizations for release of medical records; and, Plaintiff's telephone calls to her Call-Center Absence Manager, Plaintiff allegedly received thirty-nine (39) automatically accrued points of discipline for alleged no call/no show and/or absent without approval between 06/16/2012 and 06/27/2014. Many of these dates listed by Defendant were or should have been covered by Plaintiff's requests for leave based on her mental impairments, of which Defendant

and/or its agents designated to handle short term disability leave <u>and</u> job accommodations had direct notice and knowledge.

43. On July 7, 2014, Defendant informed Plaintiff that she was no longer employed by Defendant as of July 3, 2014, because it alleged she was not approved for disability benefits as of May 28, 2014; was ineligible for further FMLA benefits; and that she failed to request and/or was not approved for time off from work as a possible accommodation under the ADAAA.

44. On July 8, 2014, AT&T IDSC acknowledged Plaintiff's request for additional time to submit documentation in her appeal for short term disability benefits. Further, on August 4, 2014, AT&T IDSC reversed its denial of short-term disability benefits and approved Plaintiff for the period of May 28, 2014 through July 2, 2014.

45. Plaintiff's doctor, Dr. Thompson, provided an updated *Initial Physician Statement* on July 14, 2014 to AT&T IDSC, again stating Plaintiff's mental impairments were expected to improve after continued treatment and medical leave.

## VI.  CAUSES OF ACTION

### Count I:  Americans With Disabilities Act (As Amended)

Plaintiff re-alleges and incorporates by reference each and every fact and allegation contained in each and every aforementioned paragraph (1 through 45) as though fully set forth herein.

46. The ADA Amendments Act of 2008 (ADAAA) applies to Plaintiff's ADA claims of failure to accommodate and wrongful termination, because those actions took place on or after January 1, 2009.  Pub. L. 110–325, § 8, 122 Stat. 3553 (Sep. 25, 2008), codified at, e.g., 42 U.S.C. § 12101 *et seq.*

47. Defendant(s) conduct as alleged in the numbered Paragraphs above is in violation of

Plaintiff's rights under the Americans with Disabilities Act (as amended), 42 U.S.C. § 12101 *et seq*. Specifically, said violation(s) occurred as a result of Defendant's multiple failures, after receipt of medical documentation that detailed related work restrictions and physical and mental impairment, to grant Plaintiff's requests for reasonable accommodations pursuant to the ADAAA; and Defendant's multiple failure(s) to engage in an interactive process, in good faith, with Plaintiff on how to implement or effect appropriate reasonable accommodations. Plaintiff was regarded and known by Defendant to have an actual and recorded physical disability pursuant to the ADAAA and suffered disparate treatment as a result of her specific physical and mental impairments.

48. At all relevant times, Plaintiff was a "qualified employee" pursuant to 42 U.S.C. § 12111(8) of the ADAAA.

49. At all relevant times, Defendant(s) were "covered" employers pursuant to 42 U.S.C. § 12111(5)(A) of the ADAAA.

50. Plaintiff was regarded and known by Defendant to have an actual, and recorded, physiological impairment that was permanent in nature and that substantially limits Plaintiff in several major life activities, including but not limited to brain function, struggling to get out of bed in the morning, difficulty sleeping, maintaining personal hygiene, controlling outbursts of crying and other emotions, and maintaining concentration. Defendant also unlawfully discriminated against Plaintiff because she was regarded as and/or known to be actually and recorded as disabled by Defendant pursuant to the definitions provided in the ADAAA.

### Count II: Americans With Disabilities Act (As Amended)

Plaintiff re-alleges and incorporates by reference each and every fact and allegation contained in each and every aforementioned paragraph (1 through 45) as though fully set forth

herein as follows:

51. Defendant retaliated against Plaintiff in violation of the ADA Amendments Act of 2008 (ADAAA). The ADAAA applies to Plaintiff's ADA claims of retaliation, interference and intimidation, because those actions took place on or after January 1, 2009. Pub. L. 110–325, § 8, 122 Stat. 3553 (Sep. 25, 2008), codified at, e.g., 42 U.S.C. § 12203(a)-(b).

52. Defendant(s) conduct as specifically alleged in paragraphs 34 through 45, constituted violations of Plaintiff's rights under the Americans with Disabilities Act (as amended), 42 U.S.C. § 12203(a)-(b). Specifically, said violation(s) occurred as a result of Defendant's retaliatory actions against Plaintiff following her requests for a reasonable accommodation pursuant to the ADAAA; Defendant's interference with Plaintiff's right to engage in an interactive process, in good faith, on how to implement or effect appropriate reasonable accommodations; and, Defendant's unreasonable termination of Plaintiff in July of 2014, another act of retaliation under the ADAAA.

53. The Defendant's violations of the ADAAA injured and damaged Plaintiff.

54. The Defendant has intentionally, deliberately, willfully, and callously disregarded the lawful rights of Plaintiff.

55. By reason of the Defendant's acts of discrimination and retaliation under the ADAAA, Plaintiff is entitled to all legal and equitable remedies available under the ADAAA.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kirsten Williams respectfully prays that this Honorable Court:

    A.    Declare and adjudge that the Defendant(s) has violated Plaintiff s rights under 42 U.S.C. § 12101 *et seq.*

    B.    Order Defendant(s) to return Plaintiff to her former position of employment with

       Defendant(s);

C.     Order Defendant(s) to immediately cease and desist from all retaliatory behavior as described in this Complaint;

D.     Award Plaintiff nominal damages;

E.     Award Plaintiff compensatory damages, including back-pay and for emotional pain and suffering;

F.     Award Plaintiff punitive damages;

G.     Award Plaintiff the costs of this action and reasonable attorney's fees;

H.     Award Plaintiff pre-judgment and post-judgment interest on the foregoing sums; and,

I.     Award Plaintiff such other relief as the Court deems just and proper.

## VIII. TRIAL BY JURY

Plaintiff respectfully demands a trial by jury on all issues.

**Dated:** March 2, 2015

                                               **Respectfully submitted,**

                                               s/ Steve Wilson (TN BPR #028460)
Steve Wilson, The Steve Wilson Firm
5100 Poplar Ave., Ste. 2700
Memphis, TN 38137
Main: (901) 337-1300
Fax: (901) 372-1446
steve@stevewilsonfirm.com

s/ Matt Gulotta (TN BPR #028194)
Matt Gulotta, The Gulotta Firm
40 South Main Street, Ste. 1540
Memphis, TN 38103
Main: (901) 213-6648
Fax: (901) 410-5373
matt@gulottalaw.net

*Attorneys for Plaintiff*