IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
| **KIRSTEN WILLIAMS** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Docket No: 2:15-cv-02150-STA-dkv |
| v. | ) | |
| | ) | |
| **AT&T MOBILITY SERVICES, LLC** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kirsten Williams filed this action against her former employer, AT&T Mobility Services, LLC ("AT&T"), alleging that AT&T violated her rights under the Americans with Disabilities Act (as amended), 42 U.S.C. § 12101 *et seq.* ("ADA"). (ECF No. 1.) Defendant AT&T has filed a motion for summary judgment. (ECF No. 38). Plaintiff has filed a response to the motion (ECF No. 47-1), and Defendant has filed a reply to the response. (ECF No. 51.) For the reasons set forth below, Defendant's motion is **GRANTED**.[1]

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2] When deciding a motion for summary judgment, the court must review all the evidence and

---

[1] On May 16, 2016, the Court granted Plaintiff's motion for partial summary judgment on the sole issue of whether, at the time of the relevant events, she was disabled as defined by 42 U.S.C. § 12102(1). (Order, ECF No. 53.)

[2] Fed. R. Civ. P. 56(c).

draw all reasonable inferences in favor of the non-movant. [3]  In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations or weigh the evidence."[4]

When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." [5]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[6] The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[7]  The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."[8]

<u>Statement of Facts</u>

Initially, Defendant AT&T contends that Plaintiff has not sufficiently complied with Rule 56.1 of the Local Rules of this Court in her response.[9]  According to Defendant, Plaintiff's sixty-three page response to its statement of undisputed facts is "a hodge podge of

---

[3]  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[4]  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

[5]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).

[6]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[7]  *Id.* at 251 - 52.

[8] *Celotex*, 477 U.S. at 322.

[9]  (Reply, pp. 1-3, ECF No. 51.)

non-answers, argument, or challenges to the inferences the Plaintiff reads into the facts stated."[10]

Local Rule 56.1(a) requires that any motion for summary judgment be "accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial."[11] Any party opposing summary judgment must respond to each fact stated by the movant by agreeing that it is undisputed, agreeing that it is undisputed for purposes of ruling on the summary judgment motion only, or by demonstrating that the

---

[10] (*Id.* at p. 2.)

[11] Local Rule 56.1 provides as follows:

> (a) Moving Party. In order to assist the Court in ascertaining whether there are any material facts in dispute, any motion for summary judgment made pursuant to Fed. R. Civ. P. 56 shall be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial. Each fact shall be set forth in a separate, numbered paragraph. Each fact shall be supported by a specific citation to the record. If the movant contends that the opponent of the motion cannot produce evidence to create a genuine issue of material fact, the proponent shall affix to the memorandum copies of the precise portions of the record relied upon as evidence of this assertion.....

> (b) Non-moving Party. Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either:(1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed. Each disputed fact shall be filed with any memorandum in response to the motion. The response must be made on the document provided by the movant or another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant. In either case, the non-movant must make a response to each fact set forth by the movant immediately below each fact set forth by the movant. In addition, the non-movant's response may contain a concise statement of additional facts that the non-movant contends are material and as to which the nonmovant contends there exists a genuine issue to be tried. Each such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute.

fact is disputed, with specific citations to the record.[12]   "Failure to respond to a moving

party's statement of material facts ... shall indicate that the asserted facts are not disputed for

purposes of summary judgment."[13]   Rule 56(e) of the Federal Rules of Civil Procedure also

provides that if a party "fails to properly address another party's assertion of fact ..., the court

may consider the fact undisputed for purposes of the motion."[14]

As this Court stated in a previous case, "Argument in responses to statements of

material facts clouds issues…."[15]   In this case, despite Plaintiff's "clouding of the issues" by

inserting argument and unsupported inferences in her response to Defendant's statement of

facts,[16] the Court is able to discern factually based disputes and whether those disputed are

material and will make its decision accordingly.   To the extent that Plaintiff has presented any

facts in her response that are not material or relevant to the issues presented by Defendant's

motion, the Court will disregard those facts except as necessary to provide context or

background.[17]   The following facts are undisputed except as noted.[18]

Plaintiff was a Customer Service Representative with Defendant AT&T from 2006 to

July 3, 2014, when she was terminated.   Her job was to answer inbound calls and assist with

---

[12]   LR 56.1(b).

[13]   LR 56.1(d).

[14]   Fed. R. Civ. P. 56(e)(2).

[15]   *Maverick Grp. Mktg., Inc. v. Worx Envtl. Products, Inc.*, 99 F. Supp. 3d 822, 827 (W.D. Tenn. 2015).

[16]   (ECF No. 47.)

[17]   *C.f. Hillman v. Shelby Cty.*, 2012 WL 681778 at *1 (W.D. Tenn. Feb. 29, 2012) ("[C]ourts in the Western District of Tennessee do not strike inadmissible portions of affidavits; instead, they disregard the inadmissible testimony in their evaluation of the summary judgment motion before them.")

[18]   (Def's SOF, ECF No. 39; Pl's Resp. to SOF, ECF No. 47.)

technical support and billing at Defendant's Call Center.

Laura McArthur was the Attendance Manager, Lisa Todd-Kyle was the Attendance Analyst, and Darcus Payne was the Area Manager for the Memphis Call Center employees, including Plaintiff.

In performing her work as a Customer Service Representative, Plaintiff typically fielded about forty telephone calls a day. She worked an eight hour shift which changed every six months.

The job requires the Customer Service Representative to remain stationary for the majority of an eight hour shift and potentially longer when overtime is required. The representative signs on to a computer and stays at the workstation with the exception of allotted breaks and a lunch period.[19]

Among other performance standards, Plaintiff's work as a Customer Service Representative was subject to and governed by Defendant's Attendance Guidelines. The Attendance Guidelines state that regular attendance and timeliness are essential job functions for every Customer Service Representative. The Guidelines state that repeated unscheduled absenteeism may result in discipline up to and including termination.[20]

The Memphis Call Center accepts incoming customer service calls from all over the nation. Call Center Workforce Management forecasts the volume of calls anticipated to be routed to the Memphis Call Center and schedules the workforce accordingly. Peak call loads

---

[19]  Plaintiff's response to Defendant's statement of facts adds that she also left her desk for meetings and training and that Defendant allowed her three additional breaks as an accommodation beginning August 2012. (Pl's Resp. to SOF, ¶¶ 3 – 4, ECF No. 47.)

[20]  Plaintiff's response points out that the Guidelines allow for scheduled leave and other excused absences. (*Id.* at ¶ 5.) Plaintiff also notes that her actual job description, as opposed to the Attendance Guidelines, does not list regular attendance or timeliness as an essential function. (*Id.*)

occur early in the morning and late in the evening.

Unscheduled time away from work by Customer Service Representatives negatively impacts the level of and quality of service the representatives can offer customers. It forces Defendant to spread the work anticipated to be covered by the absent representative over the remaining representatives in attendance, increasing their call loads and potentially slowing response time over the entire center.[21] Longer wait times leads to customer frustration, and workforce morale may suffer as a result of added job pressure.[22]

Under the Attendance Guidelines, "unscheduled time away" due to absences, late arrivals, or early departures is tracked using an "unscheduled absence point system."[23]

Absenteeism is measured based on a rolling twelve-month calendar. The Attendance Guidelines state that "any unscheduled time away from your scheduled shift in excess of 8 total points in a rolling 12 months of active employment, regardless of reason, will be considered unacceptable absenteeism and will result in termination absent extraordinary

---

[21] Plaintiff disputes this fact to the extent that it implies that her absences were unscheduled. The Court does not read Defendant's statement as having any such implication. (*Id.* at ¶ 7.)

[22] Plaintiff also disputes any implication in this statement that her absences were unscheduled. (*Id.* at ¶ 8.) Again, the Court does not read the statement as having this implication. Additionally, Plaintiff contends that Defendant has offered no "supporting evidence or data" that longer wait times may lead to customer frustration and that workplace morale may suffer as a result. (*Id.*) The Declaration of Darcus Payne, one of Defendant's area managers, was offered by Defendant in support of this statement and is made on the "personal knowledge" of Payne. (ECF No. 38-2.) Customer reaction and workplace morale are areas within the purview of an area manager. Therefore, Plaintiff's argument is without merit. *See Counts v. Kraton Polymers, U.S. LLC*, 260 Fed. App'x 825, 830 (6th Cir. 2008) ("After reviewing the affidavit, we conclude that based on Mulford's status as human resources manager of Kraton, he was competent to make the statements contained in his affidavit.")

[23] Rather than agreeing or not agreeing with this statement, Plaintiff argues that her leave was not accurately recorded and that her requests for an accommodation under the ADA were ignored. (Pl's Resp. to SOF, ¶ 9, ECF No. 47.) Plaintiff's argument is not responsive to Defendant's statement of fact, and Defendant's statement as to its attendance policy is deemed to be undisputed.

circumstances as determined by the Company in its sole discretion."[24]

When an employee has an absence occurrence lasting more than eight calendar days in the preceding twelve months of employment that is approved for short term disability ("STD") under Defendant's benefit plan, the absence is excused when determining the employee's active employment.[25]

Absences incurred during a leave approved under the Family and Medical Leave Act ("FMLA") do not result in assessment of unscheduled absence points. But, absences due to illness or injury that are not covered by FMLA or STD or which are not protected by approved job accommodation will subject an employee to the accumulation of points under the Attendance Guidelines.[26]

As with all employees, Plaintiff's attendance history was maintained by Defendant and was available for her review at her request. An employee's attendance history shows points incurred and the dates those points expire. A computer program tracks the attendance point data, automatically calculates the expiration dates for attendance points assessed, and takes into account any period of absence that extends the expiration dates for the points.[27]

Although Plaintiff missed work days in 2013, she was able to use a combination of

---

[24] Again, Plaintiff attempts to use her response to this statement to argue that Defendant did not maintain accurate records (*id.* at ¶ 10), and, again, the Court notes that Plaintiff's argument is not responsive to Defendant's statement of fact, and Defendant's statement is deemed to be undisputed.

[25] Plaintiff continues to make her non-responsive argument that Defendant did not maintain accurate attendance records even though Defendant's statement refers to its general attendance policy and not how it was applied to Plaintiff. (*Id.* at ¶ 11.)

[26] Plaintiff, again, does not dispute Defendant's statement of its attendance policy but, instead, its execution. (*Id.* at ¶ 12.)

[27] Plaintiff disputes Defendant's statement on the ground that the attendance policy was not accurately applied to her or her co-workers. (*Id.* at ¶ 13.) *See* footnotes 23 – 26, *supra*.

approved STD and FMLA leave to avoid termination.[28]

Plaintiff was off work on STD from January through July 2013. She worked a few days in August 2013. She resumed STD in September 2013, which continued throughout October and part of November and December 2013.[29]

Plaintiff returned to work on January 20, 2014. Prior to her return, she had been absent from work since December 3, 2013.[30] At that time, Plaintiff's points were below the termination threshold. On January 30, 2014, and February 4, 2014, Plaintiff's managers discussed the attendance policy with her, and she stated her understanding of the policy.

On February 20, 2014, Plaintiff received her 2013 Performance Appraisal. As part of the evaluation, her supervisor evaluated her performance as not meeting Defendant's expectations for "Attendance and Punctuality."[31]

On March 11, 2014, Plaintiff reported to management that she had accessed a customer's account data more than once to verify her suspicions that the customer was having an affair with her husband. Plaintiff acknowledges that her action was a violation of Defendant's Code of Conduct.[32]

During the period between March 11, 2014, and Plaintiff's last day of active work on

---

[28] Plaintiff disputes this statement to the extent that it implies that Plaintiff did not qualify for approved leave. (*Id.* at ¶¶ 14 - 15.) The statement contains no such implication. Defendant's statement plainly says that the leave was approved.

[29] Plaintiff makes the same argument as she made for paragraphs fourteen and fifteen. (*Id.* at ¶ 16.) *See* footnote 28 above.

[30] Plaintiff makes the same argument as she made for paragraphs fourteen, fifteen, and sixteen. (*Id.* at ¶ 17.) *See* footnote 28 above.

[31] Plaintiff does not dispute that she received a negative evaluation, but, instead, argues that she did not deserve that kind of evaluation. (*Id.* at ¶ 19.)

[32] Plaintiff attributes her action to her depression and anxiety. (*Id.* at ¶¶ 20 - 22.) Defendant did not rely on this incident as a ground for Plaintiff's termination, and, therefore, the Court has not referred to the incident in its analysis of Plaintiff's claims.

April 9, 2014, Plaintiff missed several days of work. Plaintiff was not physically present at work from April 9 through the date of her termination on July 3, 2014.[33]

Plaintiff sought approval for her absences occurring after February 4, 2014, by having the absences covered by either FMLA leave, STD, or a job accommodation.[34]

FMLA leave requests are handled internally by Defendant's FMLA Operations Group. STD benefit requests and job accommodation requests are handled for Defendant by a third party administrator, Sedgewick Claims Management Services.[35] Sedgewick's Claims Management Services manages Defendant's Integrated Disability Service Center ("IDSC"). The IDSC publishes a guide which was available to Plaintiff online and in print for use in processing her STD and job accommodation claims.

Case Managers within the IDSC determine claims made for STD based on objective medical information provided by an employee's medical treatment providers. Only the IDSC has the authority to determine whether claims made by an employee qualify for STD. STD is awarded under Defendant's Short Term Disability Plan as wage replacement benefits for the employee's temporary absence from work. Absences for which STD is awarded do not incur attendance points under the Attendance Guidelines. Similarly, the IDSC determines whether job accommodation requests are medically necessary by reviewing information provided by an employee's medical care provider. If a request is determined to be medically necessary,

---

[33] Although Plaintiff does not dispute Defendant's statement that she was not physically present at work during this time period, she contends that she was seeking approved leave for these days and had requested an accommodation under the ADA "which would have allowed her back to work based on her request for a flexible/modified schedule." (*Id.* at ¶ 24.)

[34] Plaintiff objects to any implication in this statement that she should not have been granted leave. (*Id.* at ¶ 25.) The Court does not read Defendant's statement as containing any such implication.

[35] Plaintiff continues to dispute "inferences" in Defendant's statements where there are none. (*Id.* at ¶ 26.)

the IDSC contacts the employee's work department which then confirms whether or not the work accommodation can be provided.[36]

Plaintiff pursued STD benefits and a job accommodation because of her anxiety and depression.

Plaintiff communicated with the IDSC over the provision of information by her medical treatment providers to support her STD and job accommodation claims, talking with them "20 or 30 times possibly." There was also communication between Plaintiff's medical treatment providers and the IDSC.[37]

Plaintiff had unscheduled time away from work on March 12, 13, 16, 17, 20, 23, 24, and 25, 2014, and on April 7, 8, and 9, 2014. Each of these absences incurred attendance points under the Attendance Guidelines.[38] Because she had not worked 1,250 hours in the twelve months preceding her absences, Plaintiff was unable to use FMLA to cover her unscheduled absences.

On April 10, 2014, the IDSC closed Plaintiff's request for a job accommodation to excuse her unscheduled absences on the ground that Plaintiff had failed to provide medical

---

[36] Despite Plaintiff's contentions (*id.* at ¶¶ 28 – 29), there are no negative "inferences" in these statements.

[37] Plaintiff's response to this statement is confusing, to say the least. She disputes Defendant's statement that she was "in **constant** communication with the IDSC" about her leave "to the extent the statement [implies] Defendant was unaware or not kept informed" about Plaintiff's requests for an accommodation. (*Id.* at ¶ 31 (emphasis added).) The possible "inference" that Plaintiff seeks to refute is the opposite of what Defendant's statement actually says. Contradictorily, in addition to contending that the statement implies that Defendant was not aware of her requests, she also objects to the statement to the extent that it implies that Defendant was more aware than it actually was. (*Id.*) Plaintiff's deposition testimony that she talked to the IDSC "20 or 30 times possibly" speaks for itself.

[38] Plaintiff states that these dates should have been covered by her request for an ADA accommodation, but she does not dispute that she actually received attendance points for the dates. (*Id.* at ¶ 32.)

information to support her request.[39]

Beginning April 10, 2014, Plaintiff sought to cover her absences from that date going forward by having them treated as either STD or job accommodation absences.[40] On April 29, 2014, after review of the submitted medical information, the IDSC approved STD for Plaintiff's absences from April 10, 2014, through April 27, 2014.[41] The IDSC denied STD for Plaintiff's absences from April 27, 2014, going forward on the ground that Plaintiff had not provided sufficient medical information.[42]

Because Plaintiff's absences from April 27, 2014, were not excused, Defendant issued Plaintiff a letter directing her to return to work by May 12, 2014. In discussions with Defendant's Attendance Analyst, Plaintiff stated she could not return to work during the month of May and that she would continue to have medical information sent to the IDSC.[43]

After a review of additional submitted medical information, the IDSC approved STD

---

[39] Plaintiff does not dispute the fact that her request for a job accommodation was closed for the stated reason. (*Id.* at ¶ 34.) Instead, she argues that she cooperated with Defendant as best she could but that her medical appointment was after the deadline for submitting paperwork to Defendant and Defendant would not grant her any further extensions of time. (*Id.*)

[40] Plaintiff disputes this fact to the extent that it implies that she only began seeking an ADA accommodation on April 10. (*Id.* at ¶ 35.) The Court does not read this statement as having such an implication.

[41] Plaintiff disputes this fact to the extent that it implies that she only requested leave from April 10 to April 27, 2014, and for the leave to be covered by STD instead of the ADA. (*Id.* at ¶ 36.) Again, the Court does not read the statement as having this implication.

[42] Plaintiff contends that this ground was not reasonable but does not dispute that this was Defendant's stated reason for denying her additional STD leave. (*Id.* at ¶ 37.)

[43] Nothing in this sentence implies that Plaintiff did not ask for a flexible work schedule as an ADA accommodation. (*Id.* at ¶ 38.) In fact, the crux of Plaintiff's claim is that Defendant denied her request for a flexible work schedule as a "reasonable accommodation" under the ADA.

for Plaintiff's absences from April 28, 2014, through May 27, 2014.[44]  On May 28, 2014, the

IDSC denied STD for Plaintiff's absences May 28, 2014, and thereafter on the ground that

she had provided insufficient medical information.[45]  Subsequently, Plaintiff was sent a letter

directing her to return to work by June 10, 2014, in order to remain employed.[46]

Plaintiff did not return to work by June 10, 2014.  As of June 11, 2014, she had

accumulated twenty-six attendance points, which was in excess of the eight point threshold

for termination stated in the Attendance Guidelines.[47]  Defendant began the process for

obtaining approval of Plaintiff's termination from employment for accumulation of excessive

attendance points and for job abandonment for failure to return to work as directed.[48]

Plaintiff's record of attendance prior to her termination shows that she received

warnings regarding her attendance point accumulations each year of her employment from

2007 through 2014, with a final written warning for attendance being issued to her on March

---

[44]  There are no untoward inferences to be drawn from this statement of fact.

[45]  Plaintiff does not dispute that this was the stated ground for the denial of her leave.
Instead, she argues that the denial was not reasonable.   (*Id.* at ¶ 40.)

[46]  Again, Plaintiff does not dispute this fact itself but, rather, argues that the demand for her
to return to work was not reasonable.  (*Id.* at ¶ 41.)

[47]  Plaintiff contends that Defendant's attendance policy was not applied consistently and,
again, argues that Defendant ignored her requests for an accommodation under the ADA.  (*Id.*
at ¶ 42.)  Plaintiff also states that she was not warned that she was accumulating attendance
points that could be used for discipline or termination, even though she acknowledges that the
Attendance Guidelines contain such a provision. (*Id.*; Pl's Resp., p. 4, ECF No. 47-1.)  None
of these arguments is responsive to Defendant's statement of fact.  Finally, Plaintiff contends
that Defendant did not calculate her attendance points correctly because Defendant allegedly
erroneously assessed "penalty points" by recording her absences as "Illness – Unpaid" rather
than correctly listing the absences as "unexcused." (Pl's Resp. to SOF, ¶ 42, ECF No. 47.)
In its reply, Defendant has submitted the second declaration of its Attendance Manager, Laura
McArthur, which refutes Plaintiff's assertion that her points were not calculated correctly.
(ECF No. 51-1.)  According to McArthur, Defendant uses the code "ILLU" or "Illness-
Unpaid" to describe an unpaid, unexcused absence that results in attendance points. (*Id.* ¶ 3.)

[48]  Plaintiff does not dispute that Defendant did, in fact, begin the process of seeking approval
for her termination.   (Pl's Resp. to SOF, ¶ 43, ECF No. 47.)

13, 2014.[49]

After June 11, 2014, Plaintiff's medical care providers provided additional information for the IDSC to review in consideration of her claims seeking STD or a job accommodation for her unscheduled absences following May 27, 2014.[50]  Rather than continue the termination process, Plaintiff's management decided to have another return to work letter sent to Plaintiff setting her return to work for June 30, 2014.[51]  Plaintiff responded that she could not return to work on June 30, 2014.[52]  Plaintiff did not return to work on June 30, 2014.[53]

Plaintiff appealed the IDSC's denial of STD for her absences from May 28, 2014, going forward.  After first determining that a successful appeal would still leave Plaintiff with sixteen attendance points, Memphis Call Center Management made the decision to terminate

---

[49]  "Plaintiff concedes she received written warnings in 2007, 2008, 2009 and 2010," but she contends that she merely received counseling for attendance in 2011.  (*Id.* at ¶ 44.)  She also acknowledges that her 2012 performance appraisal stated that "she failed to meet Defendant's expectations for attendance," and she references a written warning that she received in 2014. (*Id.*)

[50]  Plaintiff disputes this statement to the extent that it implies that Plaintiff and her medical providers only began to submit information to the IDSC after June 11, 2014, or that she did not have ongoing contact with Defendant about her absences.  (*Id.* at ¶ 45.)  There is no such implication contained in Defendant's statement. Defendant has already acknowledged that Plaintiff had regular contact with the IDSC concerning her medical information and leave. *See* footnote 37, *supra*.

[51]  Once again, rather than responding to Defendant's statement, Plaintiff attempts to argue her case, i.e., the statement is disputed to the extent it implies that Defendant was not on notice of her treatment for depression and anxiety or her request for a flexible work schedule as an accommodation and that Defendant did not accurately record her attendance points.  (*Id.* at ¶ 46.)  Plaintiff's arguments are not responsive to Defendant's statement.

[52]  Plaintiff disputes this statement to the extent that it implies that she was able to return to work or that she had not provided Defendant with enough information to qualify for STD or ADA protection.  (*Id.* at ¶ 47.)  The Court has not drawn any such inferences from Defendant's statement.

[53]  Plaintiff notes that she was still in treatment for her depression on this date.  (*Id.* at ¶ 49.)

Plaintiff's employment as of July 3, 2014, for having incurred more than eight attendance points in violation of Defendant's Attendance Guidelines and for having abandoned her job by not reporting to work.[54]

Plaintiff has submitted her own statement of undisputed facts as follows.[55] Plaintiff believes that her request for a flexible work schedule would involve an hour adjustment to her start time. She needed this adjustment to her start time because, when she began her work shift at 6:15 or 6:30 a.m., she would still be "cloudy" from her medicine, and it took a while to get adjusted. Her request for a later start time did not mean that she would call and simply say she could not make it to work on time, but, rather, she wanted a daily adjustment to the start time for a matter of weeks or a month. She was also prepared to work later in the evenings to make up for the later start time. Plaintiff interpreted her request for flexible breaks to be ten minutes every two hours. Plaintiff believed that she "just needed to take a moment to calm down after [a stressful call.]"[56]

Plaintiff applied for FMLA on December 12 and 20, 2013, January 10 and 13, 2014, April 4 and 29, 2014, and May 15 and 30, 2014, based on depression and need for treatment. After these requests were denied, no one contacted Plaintiff to discuss other options to accommodate or assist her with her depression. Plaintiff's 2013 Appraisal was negatively impacted by her approved leave in 2013.

Analysis

In her complaint, Plaintiff alleges that Defendant discriminated against her in violation

---

[54] Plaintiff disputes that she had this many attendance points, but she does not dispute that this was Defendant's stated reason for terminating her. (*Id.* at ¶ 50.)

[55] (Pl's SOF, ECF No. 47-2.)

[56] (*Id.* at ¶¶ 1, 2.)

of the ADA by refusing to permit her to work a flexible job schedule and giving her additional leave. She also alleges that Defendant interfered with her right to engage in the interactive process under the ADA. Finally, she alleges that she was terminated because of her disability and in retaliation for her pursuit of a reasonable accommodation under the ADA.[57] Defendant has moved for summary judgment on the grounds that the undisputed facts show that (1) "regular and predictable attendance is an essential function of the Plaintiff's job as a call center customer services representative"; (2) Plaintiff's employment was terminated because she violated Defendant's Attendance Guidelines and abandoned her job and not because she requested an ADA accommodation; (3) Plaintiff and Defendant did, in fact, engage in an interactive process concerning Plaintiff's request for a job accommodation; and (4) Plaintiff's request for a flexible work schedule was unreasonable as a matter of law.[58]

<u>Reasonable Accommodation Claim</u>

The ADA provides, in relevant part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[59] To establish a claim of failure to provide a reasonable accommodation, a plaintiff must show that (1) she is disabled within the meaning of the ADA and that (2) she is otherwise qualified for the job she holds despite her disability either without accommodation, with an essential job requirement eliminated, or with a proposed reasonable

---

[57] (Complt. at ¶¶ 1, 47, 52, ECF No. 1.)

[58] (Def's MSJ, ECF No. 38.)

[59] 42 U.S.C. § 12112(a).

accommodation.[60]  If the plaintiff carries her burden, then the defendant employer bears "the burden of proving that a challenged job criterion is essential, and therefore a business necessity," or that a proposed accommodation would impose an undue hardship on the defendant.[61]

When the employee seeks an accommodation and claims that she would be qualified to perform the essential functions of the job with such accommodation, the issues are whether such accommodation is reasonable, whether such accommodation would impose an undue hardship on the employer, and whether the plaintiff is capable of performing the job even with the suggested accommodation.[62]  "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires," but it does not include only marginal functions.[63]  An employee who cannot perform the job's essential functions is not a qualified individual under the ADA.[64]

The Court has previously determined as a matter of law that Plaintiff's depression and anxiety constitute a disability within the meaning of the ADA.[65]  Therefore, the Court must now determine if Defendant is entitled to summary judgment on the issue of whether Plaintiff is otherwise qualified for the job that she held despite her disability either without

[60]  *See Cash v. Siegel-Robert, Inc.*, 548 Fed. App'x 330, 334 (6th Cir. 2013); *see also Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004).

[61]  *Hedrick*, 355 F.3d at  452.

[62]  *Id.*

[63]  29 C.F.R. § 1630.2(n)(1).

[64]   *Hoskins v. Oakland Cnty. Sherriff's Dep't*, 227 F.3d 719, 724 (6th Cir. 2000).  Any argument by Defendant that Plaintiff is unqualified to perform her job rests on its argument that she failed to comply with its attendance requirements that were an essential function of her job.

[65]  (Order Grt'ing Pl's MPSJ, ECF No. 53.)

accommodation, with an essential job requirement eliminated, or with a proposed reasonable accommodation. The Court finds that Defendant is entitled to summary judgment because Plaintiff cannot show that she can perform an essential function of her job with or without a reasonable accommodation.

Plaintiff's proposed "reasonable accommodation" was a flexible job schedule that consisted of "an extension of unpaid leave for ongoing treatment of her major depressive disorder, and, a flexible schedule involving up to 1 hour late start and finish times, with extra breaks when needed for panic attacks."[66] Plaintiff testified that she had panic attacks up to three times a day in response to "stressful" calls, and that there was no way to plan around when she would receive a stressful call.[67] The proposed flexible schedule would have lasted "[a]s long as needed."[68]

Plaintiff does not contend that she could do her job despite her disability without an accommodation. Instead, she proposed an accommodation that, according to Defendant, would have eliminated an essential job requirement, i.e., punctuality and regular attendance. Accordingly, the Court must determine whether punctuality and regular attendance were essential functions of Plaintiff's job.

---

[66] (Pl's Resp., p. 14, ECF No. 47-1.) These unscheduled breaks were to be in addition to the fifteen minute break Plaintiff ordinarily received after two hours of work, her lunch hour, and a fifteen minute break two hours after lunch. (Pl's Depo., pp. 109-111, ECF No. 37.) Plaintiff admits that she was "'often' able to leave her work station at any time for restroom breaks." (Pl's Resp., p. 3, ECF No. 47-1.) Additionally, Plaintiff acknowledges that Defendant did, in fact, provide her with unpaid leave to accommodate her disability prior to her termination through its STD policy. (*Id.* at p. 18 (stating that Defendant "tried to end run the ADA by using the STD process to subsume all its obligations.")).

[67] (Pl's Depo., pp. 110, 112, ECF No. 37.)

[68] (*Id.* at p. 69.)

As explained in *Denman v. Davey Tree Expert Co.*,[69]

> "A job function is essential if its removal would fundamentally alter the position." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001) (quotations marks and citations omitted). The inability to attend work can "fundamentally alter" a position which requires attendance to perform tasks. *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412 (6th Cir. 2004) (attendance can be an essential function of a position and excessive absenteeism rendered an employee unqualified for position); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (employee who cannot meet the attendance requirements of the job cannot be a "qualified" individual protected by the ADA).

Defendant cites *EEOC v. Ford Motor Co.*,[70] for the proposition that regular attendance is generally an essential function of most jobs and that the ADA does "not endow all disabled persons with a job - or job schedule - of their choosing."[71]

Although *Ford Motor Co.* involved a telecommuting request by the plaintiff employee, the reasoning of that case is instructive in the present case.[72] The Court noted that a "'reasonable accommodation' may include 'job restructuring [and] part-time or modified work schedules,' but it does not include removing an 'essential function [ ]' from the position, for that is *per se* unreasonable."[73] The Court relied on a "commonsense notion" in holding that "[r]egular, in-person attendance is an essential function - and a prerequisite to essential functions - of most jobs, especially the interactive ones."[74] The Court upheld the grant of

---

[69] 266 Fed. App'x 377, 380 (6th Cir. 2007).

[70] 782 F.3d 753, 757 (6th Cir. 2015).

[71] *Id.* at 757, 761-63.

[72] Telecommuting would not have been an option for Plaintiff because she would still have been faced with the issues of being "cloudy" at the beginning of the work day and needing breaks whenever she received a "stressful" call.

[73] *Id.* at 761 (citations omitted).

[74] *Id.* at 762-63.

summary judgment to Ford because "[r]egular and predictable on-site attendance was essential for [the employee's] position, and [the employee's] repeated absences made her unable to perform the essential functions of a resale buyer."[75]

In this case, Defendant has presented unrefuted evidence that Plaintiff's work as a Customer Service Representative, also an "interactive" position, was governed by Attendance Guidelines which stated that regular attendance and timeliness are essential job functions and that repeated unscheduled absenteeism may result in discipline, including termination.[76] It is undisputed that Defendant's Call Center must be staffed with a sufficient number of representatives to service incoming call loads and that peak call loads occur early in the morning and late in the evening.[77] Plaintiff worked as part of a team responding to service inquiries from customers seeking help in resolving problems with their phones or services purchased.[78] Her team worked eight hour shifts, with each Customer Service Representative manning a computer and a telephone, answering and servicing as many as forty to fifty

---

[75] *Id.* at 763. Plaintiff attempts to distinguish her case from *Ford Motor Co.* in that the employee in that case was required to have some face-to-face contact with customers and had previously tried a flexible work schedule and telecommuting which did not work out. (Pl's Resp., pp. 16-17, ECF No. 47-1.) These distinctions do not outweigh the *Ford Motor Co.* Court's reliance on the employer's judgment and the consequences of not requiring the plaintiff to attend work in the office in holding that attendance was an essential function of the plaintiff's job. 782 F.3d at 762-63. Moreover, Plaintiff's job required team work and a high level of interaction with the public, as did the *Ford Motor Co.* employee's job.

[76] (Pl's Resp. p. 4, ECF No. 47-1.) *See Wagner v. Sherwin-Williams Co.,* 2015 WL 5174130 at *3 (E.D. Ky. Sept. 2, 2015), *aff'd sub nom. Wagner v. Sherwin-Williams Co.,* 2016 WL 2641257 (6th Cir. May 10, 2016) (stating that, to determine what is an essential function of a job, "the ADA itself provides two factors for courts to consider: 'the employer's judgment as to what functions of a job are essential," and any "written [job] description[s].' 42 U.S.C. § 12111(8).").

[77] (Pl's Resp. Def's SOF, ¶¶ 6 -7, ECF No. 47.)

[78] (*Id.* at pp. 47 - 49.)

telephone calls per day.[79]

Peak call loads occur early in the morning and late in the evening.[80]  The Call Center must be staffed with a sufficient number of Customer Service Representatives to service incoming call loads, and consistent and predictable attendance by the representatives staffing the Call Center is critical to its efficient delivery of services.[81]

When a Customer Service Representative does not show up to work as scheduled, the representatives who do report to work have their call volumes increased to pick up the slack.[82] Morale problems are enhanced by unscheduled absences during peak call periods, and the quality of customer service suffers.[83]  To function effectively, the Call Center depends on its representatives to show up for and remain at work as scheduled.[84]

Plaintiff argues that work schedules may be modified as a job accommodation under Defendant's Integrated Disability Service Center Guide which provides that, if an employee's "condition requires a reduced work schedule or time off work (no matter the duration) that does not qualify for disability benefits under your disability benefits plan and you are not

---

[79]  (*Id.*)

[80]  (Pl's Resp. to SOF, ¶¶ 6 – 8, ECF No. 47.)  *See* footnote  22, *supra*, rejecting Plaintiff's argument that Defendant offered no "supporting evidence or data" that longer wait times may lead to customer frustration and that workplace morale may suffer as a result and finding that the Declaration of Darcus Payne (ECF No. 38-2), one of Defendant's area managers, in support of this statement was made on the "personal knowledge" of Payne and was admissible.

[81]  (*Id.*)

[82]  *See* footnote 78, *supra*.  *See also* Payne Decl. (ECF No. 38-2.)

[83]  (*Id.*)

[84]  (*Id.*)

eligible for FMLA, a job accommodation specialist will assist you with your request."[85]  She

contends that Defendant could have used other employees and contract workers to fill in for

her as needed.[86]  However, as explained in *Belasco v. Warrensville Heights City Sch. Dist.*,[87]

> [T]he ADA does not require employers to accommodate individuals by
> shifting an essential job function onto others." *Hoskins v. Oakland Cnty.
> Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000).  Likewise, the ADA does
> not require employers to hire a second person to fulfill the job responsibilities
> ordinarily performed by one person. *Johnson v. Cleveland City Sch. Dist.*, 443
> Fed. App'x 974, 986 (6th Cir. 2011) (rejecting a request for a teacher's aide as
> unreasonable).

In *Belasco*, the plaintiff employee, a school teacher with balance problems and

shortness of breath, asked for a part-time teacher's aide and for disruptive students to be

transferred to a different classroom because she was afraid that she would be knocked down.

In upholding the granting of summary judgment to the defendant school district, the Court of

Appeals found that "both actions would shift performance of essential child supervision

functions onto another employee, either in Belasco's classroom or another.  Any such

accommodations would be unreasonable, and the District was not obligated to fulfill those

requests."[88]

---

[85]  (*Id.*)

[86]  (*Id.,* p. 18.)  Plaintiff notes that Defendant could "assign 'on-call duty' employees for an
extra $36 per day."  (Pl's Resp. to SOF, ¶ 8, ECF No. 47.)

[87]  2015 WL 8538096 at *8 (6th Cir. Dec. 11, 2015).

[88]  *Id.*  In its decision, the Court mentioned that a collective bargaining agreement with the
teachers' union prohibited the employment of part-time aides without the consent of both the
prospective aide and the union, and the union did not agree to the school district's employing
part-time aides for any reason, including accommodation of a disabled employee. *Id.* at *4.
However, the Court merely pointed this out as an additional reason as to why the plaintiff
employee's proposed accommodation was unreasonable. *Id.* at *8 ("The unreasonableness of
Belasco's proposed accommodation is further illustrated by the fact, uncontroverted by
Belasco, that hiring a part-time aide would have violated the District's collective bargaining
agreement with the teachers' union because the union was unwilling to provide its consent.").
*Cf. Gardull v. Perstorp Polyols, Inc.,* 382 F. Supp. 2d 960, 965 (N.D. Ohio 2005) (finding

Likewise, in the present case, "shifting" the performance of Plaintiff's duties onto her co-workers, either when she was absent or when she was on an unscheduled "flex" break and "for as long as needed," is *per se* unreasonable. Although time off, whether paid or unpaid, can be a reasonable accommodation, an employer is not required to provide a disabled employee with indefinite leave.[89]

Plaintiff attempts to rely on *Bracey v. Michigan Bell Telephone Co.*,[90] in which the plaintiff employee, who worked at a call center, suffered from irritable bowel syndrome. The employee requested an accommodation of immediate access to a restroom and flexible break times. The employer denied her request, based primarily on the assumption that her bathroom break needs would cause her to miss too much work and be too unpredictable.[91] The *Bracey* Court denied the employer's motion for summary judgment.[92]

*Bracey* is distinguishable from the present case because, in that case, the "impact of unscheduled bathroom breaks could be reduced by locating [the employee's] cubicle next to the restroom, which [a supervisor] said could be done easily."[93] Moreover, rather than asking

---

that "although Gardull's absences were unrelated to his disability, his excessive absenteeism required his co-workers to perform his job. It therefore rendered him unqualified for the position, for which regular attendance was a requirement.")

[89] *Aston v. Tapco Int'l Corp.,* 2015 WL 7434652 at *4 (6th Cir. 2015) (determining that, when an employee's return date is not certain, an employer is not required to keep open a job for an employee indefinitely as a reasonable accommodation). According to Plaintiff her "[t]reatment was **projected** to last until August 15." (Pl's Resp., p. 7 (emphasis added), ECF No. 47-1.) At the time of her termination, she had not given Defendant a set return date, even if, after her termination, her treatment actually did end on August 15.

[90] 2015 WL 9434496 (E.D. Mich., Dec. 24, 2015).

[91] *Id.* at *3-6.

[92] *Id.* at *6.

[93] *Id.*

for additional breaks, as Plaintiff has in this case, the *Bracey* employee proposed using her regular breaks and lunch break at unscheduled times to accommodate her flare-ups.[94]

More akin to the present case is *Davis v. George Washington Univ.*,[95] in which the employee's requested accommodation was to inform his supervisor "as soon as reasonably possible that [he] was unable to report to work due to his illness."[96]  In granting summary judgment to the employer, the Court explained that "[a]lthough the ADA defines 'reasonable accommodation' to include 'part-time or modified work schedules,' [the] requested accommodation is too open-ended and is thus unreasonable as a matter of law."[97]

Here, Plaintiff s request for a "flexible" work schedule permitting her to come in late and to take breaks "as needed" and for an undetermined time period would remove an essential function from her job, i.e., punctuality and attendance, and is, therefore, *per se* unreasonable.[98]  Accordingly, Defendant is entitled to summary judgment.

Alternatively, Plaintiff's excessive absenteeism prevented her from being "qualified" for protection under the ADA.[99]  As explained in *Wheeler v. Jackson Nat'l Life Ins. Co.*,[100]

> The Sixth Circuit has long held that "[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a qualified

---

[94] *Id.*

[95] 26 F. Supp.3d 103 (D.C.C. 2014).

[96] *Id.* at 115.

[97] *Id.*

[98] *See Ford Motor Co.*, 782 F.3d at 761(removing an "essential function" from a position is *per se* unreasonable) (citing *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998) and *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n. 17 (1987)).

[99] *See Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 322 (6th Cir. 2012) (collecting cases).

[100] 2016 WL 427796 (M.D. Tenn. Jan. 4, 2016).

individual protected by the ADA." *Gantt*, 143 F.3d at 1047 (internal quotation marks omitted); *Melange v. City of Ctr. Line*, 482 Fed.Appx. 81, 84 (6th Cir. 2012) (affirming *Gantt* and finding a custodian whose job required on-site manual labor and who could not meet attendance requirements could not make a prima facie case). Accordingly, excessive absenteeism can render an individual unqualified under the ADA as a matter of law, except in the exceptional case where an employee can effectively perform at home without a substantial reduction in the quality of his performance. *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997) (citing *Vande Zande v. Wisconsin*, 44 F.3d 538, 545 (7th Cir. 1995)); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 419 (6th Cir. 2004).[101]

Under this analysis, because Plaintiff could not perform all the essential functions of her job, she was not qualified for the job.

Failure to Engage in the Interactive Process Claim

The ADA's regulations provide that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]."[102] The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."[103]

Plaintiff contends that Defendant did not participate in good faith in the interactive process. If the employer fails to participate in good faith, it faces liability under the ADA if a reasonable accommodation would have been possible.[104] Accordingly, even if the employer

---

[101] *Id.* at *13 (footnote omitted). *See also Larkins v. CIBA Vision Corp.*, 858 F. Supp. 1572, 1582 (N.D. Ga. 1994) (finding employee was not a qualified employee under the ADA because she was required to sign in to telephones for 8.5 hours per day and she conceded that taking telephone calls during that time was a major part of her job; therefore, the telephone duties were an essential function of her position, and she was unable to complete them).

[102] 29 C.F.R. § 1630.2(o)(3).

[103] *Id.*

[104] *Lafata v. Church of Christ Home for Aged*, 325 Fed. App'x 416, 422 (6th Cir. 2009) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391 (2002)).

"did not put sufficient effort into the 'interactive process' of finding an accommodation, 29 C.F.R. § 1630.2(o)(3), 'that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual.'"[105] As explained in *Ford Motor Co.*,

> Courts thus need not consider this form of non-independent liability "if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." It suffices here to hold that any failure by Ford does not create liability because, as we just concluded, the EEOC did not produce such evidence.[106]

Because Plaintiff has failed to show that she could perform the essential functions of her job with her proposed accommodation, her interactive process claims fails even if Defendant did not participate in the process in good faith.[107]

Retaliation/Discrimination Claim

Plaintiff contends that she was terminated from her position because of her disability and in retaliation for asking for a reasonable accommodation under the ADA. Defendant has moved for summary judgment on this claim on the ground that Plaintiff was terminated because of her chronic absenteeism and her job accommodation requests were not a "but for" cause of her termination.

---

[105] *Ford Motor Co.*, 782 F.3d at 766 (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013)).

[106] *Id.* (citation omitted). *See also Silva v. City of Hidalgo, Tex.*, 575 Fed. App'x 419, 424 (5th Cir. 2014) ("Accordingly, even if a genuine issue of material fact exists as to whether the City participated in the interactive process in good faith, its dereliction cannot be said to have led to a failure to reasonably accommodate Silva because there is no evidence that a reasonable accommodation was feasible.")

[107] Defendant points out that the record shows that Plaintiff talked with the IDSC between twenty and thirty times regarding her submission of medical information to support her claims, and her physicians engaged in a months-long back and forth process exchanging medical reports with the IDSC. (Pl's Depo., pp. 60 - 62, ECF No. 37.) According to Defendant, this evidence shows that it did, in fact, engage in the interactive process in good faith. There is no need for the Court to decide this issue because Plaintiff failed to show that she could perform the essential functions of her job with her proposed accommodation.

To establish a prima facie case of ADA retaliation,[108] the plaintiff must show that: (1) she was engaged in a protected activity; (2) the exercise of her civil rights was known to the defendant; (3) the defendant subsequently took an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action - in this case Plaintiff's termination.[109]  Once the plaintiff has established a prima facie case, the defendant has the burden to "prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct."[110]  If the defendant does so, then the plaintiff must "show that the proffered reason was not its true reason but merely a pretext for retaliation" by demonstrating that the defendant's proffered reason: (1) has no basis in fact, (2) did not actually motivate the defendant's action, or (3) was insufficient to motivate the defendant's action.[111]

"[T]he showing of a good-faith request for reasonable accommodation" is a "protected act" for purposes of an ADA retaliation claim.[112]  In the present case, for the purpose of deciding this motion, the Court finds that there is no dispute that Defendant knew of Plaintiff's request for an accommodation under the ADA.  Therefore, the question for the Court is whether there are facts which, if believed by the trier of fact, show a causal connection between Plaintiff's request and her termination and, if so, whether there are facts which, if believed by the trier of fact, show that Defendant's proffered reason for the

---

[108] *See Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (When a plaintiff relies on circumstantial evidence of retaliation, as in the present case, the burden-shifting evidentiary framework of *McDonnell Douglas* applies.).

[109] *See Walborn v. Erie Cnty. Care Facility*, 150 F.3d 584, 588–89 (6th Cir. 1998).

[110] *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir. 2000).

[111] *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 486 (6th Cir. 2010).

[112] *Baker v. Windsor Republic Doors*, 414 Fed. App'x 764, 776–77 & n. 8 (6th Cir. 2011).

termination was a pretext for discrimination.

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action."[113] Here, Plaintiff has not pointed to any evidence in the record showing a causal connection between her disability and request for an accommodation and her subsequent termination.

Plaintiff suggests that the proximity between her request for a reasonable accommodation and her termination is evidence that her request was a factor in her termination and, thus, establishes the requisite causation.[114] Plaintiff points to her statement to Defendant on June 27, 2014, that she could not return to work on June 30 as the beginning point and July 3, the date of her termination, as the end point in determining whether there is sufficient temporal proximity to show a causal connection. However, it is undisputed that Plaintiff asked Defendant for a flexible schedule as a job accommodation as early as February 4, 2014, five months before her termination.[115]

Although extremely close temporal proximity permits an inference of a retaliatory motive, evidence in addition to temporal proximity is required to permit the inference if close temporal proximity is not present.[116] This is not a case where the temporal proximity is so close that it suffices by itself since Plaintiff's request was made five months before her termination.[117] "The absence of close temporal proximity and the presence of an obviously

---

[113] *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

[114] (Pl's Resp., pp. 25-26, ECF No. 47-1.)

[115] (*Id.* at p. 5.)

[116] *See Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) ("[T]he law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.").

[117] *See, e.g., Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (finding no temporal proximity when adverse decision was made eight months after defendants were

nonretaliatory basis for the defendants' decision amount to insufficient evidence to permit an inference of retaliatory motive."[118]

However, even if she has shown the requisite causation, Defendant has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff, i.e., Plaintiff violated Defendant's absenteeism policy.[119] Accordingly, the burden shifts to Plaintiff to demonstrate that this reason is a pretext for unlawful discrimination.[120]

"A plaintiff may demonstrate pretext by showing that the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge."[121] "A reason cannot be proved to be 'a pretext for **discrimination**' unless it is shown **both** that the reason was false, **and** that discrimination was the real reason."[122] Plaintiff has not established pretext under any of these methods. Plaintiff cannot show that Defendant's proffered reason had no basis in fact, was not the real

---

served with another lawsuit by plaintiff); *Deister v. AAA Auto Club of Michigan*, 91 F. Supp. 3d 905, 921-22 (E.D. Mich. 2015), *reconsideration denied*, 2015 WL 1885576 (E.D. Mich. Apr. 24, 2015), and *aff'd sub nom. Deister v. Auto Club Ins. Ass'n*, 2016 WL 2731606 (6th Cir. May 11, 2016) (finding no temporal proximity when the plaintiff was not terminated until almost five months after the Auto Club learned of his protected conduct); *cf. Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (finding temporal proximity was evidence of causation when termination occurred on the same day the employer learned of protected conduct).

[118] *Vereecke*, 609 F.3d at 401.

[119] This Court has previously held that an employee's excessive absenteeism constitutes a legitimate, nondiscriminatory reason for dismissal. *See McNeil v. Sonoco Products Co.*, 2012 WL 1038767 at *11 (W.D. Tenn. Mar. 27, 2012), *aff'd*, 519 Fed. App'x 382 (6th Cir. 2013).

[120] *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008).

[121] *Gantt*, 143 F.3d at 1048–49.

[122] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original); *Edmond v. State of Tenn. Dept. of Probation & Parole*, 386 Fed. App'x 507, 515 (6th Cir. 2010); *Hughes v. Gen. Motors Corp.*, 212 Fed. App'x 497, 502 (6th Cir. 2007).

reason, or was insufficient to explain Defendant's action in terminating her.

It is undisputed that Defendant's Attendance Guidelines warn that repeated absenteeism may result in discipline up to and including termination. Under the Guidelines "unscheduled time away" due to absences, late arrivals, or early departures is tracked using an "unscheduled absence point system." Any unscheduled time away from a scheduled shift in excess of eight total points in a rolling twelve months of active employment, regardless of the reason, is considered unacceptable attendance and results in termination.[123]

The record shows Plaintiff's history of absenteeism. Plaintiff was off work on STD from January through July 2013, worked a few days in August, and then resumed STD in September 2013, which continued throughout October and part of November and December 2013.[124] She returned to work on January 20, 2014. Prior to her return, she had been absent from work since December 3, 2013.[125] On January 30, 2014, and February 4, 2014, Plaintiff's managers discussed the attendance policy with her, and she expressed her understanding of the policy. As part of her 2013 Performance Appraisal, she was evaluated as not meeting Defendant's expectations for "Attendance and Punctuality."[126] During the period between March 11, 2014, and Plaintiff's last day of active work on April 9, 2014, Plaintiff missed several days of work. Plaintiff was not physically present at work from April 9 through the date of her termination on July 3, 2014.[127]

---

[123] (Pl's Resp. to SOF, ¶ 9, ECF No. 47.) *See* footnote 23, *supra*.

[124] (*Id.* at ¶¶ 14 - 16.)

[125] (*Id.* at ¶ 17.)

[126] (*Id.* at ¶ 19.)

[127] (*Id.* at ¶ 24.) Some of these absences were covered by STD. Because she had not worked 1,250 hours in the twelve months preceding her absences, Plaintiff was unable to use FMLA to cover her unscheduled absences.

At a minimum, Plaintiff's unscheduled time away from work on February 15, 2014, March 9, 12, 13, 16, 17, 20, 23, 24, and 25, 2014, and April 7, 8, and 9, 2014, resulted in attendance points under the Attendance Guidelines. At that time, Defendant started the process for obtaining approval of Plaintiff's termination on the ground of accumulation of excessive attendance points and job abandonment for failure to return to work as directed. Plaintiff was sent a letter directing her to return to work by June 10, 2014, in order to remain employed, but she did not return to work. As of June 11, 2014, Plaintiff had accumulated twenty-six attendance points, which was in excess of the eight point threshold for termination stated in the Attendance Policy.[128] Defendant sent Plaintiff another letter setting her return to work for June 30, 2014; Plaintiff responded by stating that she could not return to work on June 30, 2014.[129] Plaintiff was terminated on July 3, 2014.[130]

As evidence of Defendant's pretext, Plaintiff points to what she terms Defendant's "unreasonable requirements for her to fully return to work, without schedule flexibility to assist her known depression and current treatment program."[131] According to Plaintiff, she would not have had to take off as often if Defendant had allowed her to have a flexible work schedule.[132] As discussed above, Plaintiff's proposed flexible work schedule was not a reasonable accommodation under the ADA. Plaintiff has cited no authority, and the Court

---

[128] (*Id.* at ¶ 42.) *See* footnote 47, *supra*, rejecting Plaintiff's argument that Defendant did not calculate her attendance points correctly.

[129] (McArthur Decl., ¶¶ 28 – 30, 33-34, ECF No. 38-1.)

[130] Plaintiff's successful appeals of STD for her absences beginning May 28, 2014, and continuing through her termination date do not overcome the undisputed fact that as of June 30, 2014, she had exceeded the number of attendance points allowed under the Attendance Guidelines. (Payne Decl., ¶¶ 22, 23, ECF No. 38-2.)

[131] (Pl's Resp, p. 24, ECF No. 47-1.)

[132] (*Id.*)

knows of none, for the proposition that the denial of a proposed accommodation that is not reasonable can be evidence of discrimination.

Also as evidence of pretext, Plaintiff contends that similarly situated employees were treated differently than she was.[133] Although Plaintiff cites to the attendance records of some of her co-workers in her response to Defendant's statement of facts,[134] these documents have not been authenticated.

Rule 803(6) of the Federal Rules of Evidence permits records of regularly conducted business activity to be admitted into evidence if the records meet certain requirements: (1) they were "created in the course of a regularly conducted business activity," (2) they were "kept in the regular course of that business," (3) they resulted from a "regular practice of the business" to create such documents, and (4) they were "created by a person with knowledge of the transaction or from information transmitted by a person with knowledge."[135] The fulfillment of these requirements must be "shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification."[136] Plaintiff has not fulfilled these requirements.

While submissions "by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial," that party must "lay[ ] out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact

---

[133] (*Id.* at p. 23.)

[134] (Pl's Resp. to SOF, ¶ 10 (referencing Pl's Exbs. H – 0, ECF No. 48), ECF No. 47.)

[135] *United States v. Collins*, 799 F.3d 554, 582-83 (6th Cir.), *cert. denied*, 136 S. Ct. 601 (2015); *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts*, LLC, 774 F.3d 1065, 1071–72 (6th Cir. 2014) ("A custodian or otherwise qualified witness must attest that the proffered document meets these conditions."); Fed. R. Evid. 803(6).

[136] Fed. R. Evid. 803(6)(D).

exists."[137] Consequently, "hearsay evidence not subject to any exception 'must be disregarded,'" and "unauthenticated documents do not suffice" to defeat summary judgment.[138]

When a document is produced in discovery, there may be sufficient circumstantial evidence to support its authenticity.[139] In the present case, it is not clear if the attendance records were produced by Defendant to Plaintiff during discovery, but even if they were and even if circumstantial evidence supports their authenticity, the documents do not establish Plaintiff's contention that similarly situation co-workers were treated differently.

> Under this method of establishing pretext, plaintiff must demonstrate that other employees outside of her protected class were not fired, even though they were similarly situated and engaged in substantially identical conduct to that which the employer contends motivated its decision. *Smith* [*v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000)]. To be similarly situated, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich* [*v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)]. Although exact correlation is not required, "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." *Smith*, 220 F.3d at 762 (quotation marks

---

[137] *Reed v. Procter & Gamble Mfg. Co.*, 556 Fed. App'x 421, 427 (6th Cir. 2014) (quoting *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009)); Fed. R. Civ. P. 56(c)(1)(A) & (4). *See also Williamson v. Scioto Twp. Trustees*, 2014 WL 4388266 at *7 (S.D. Ohio Sept. 5, 2014) (finding that neither of the documents on which the plaintiff relied was authenticated because he provided no affidavit or deposition testimony from any individual with personal knowledge addressing the existence or requirements of such a policy and declining to consider these documents in opposition to the motion for summary judgment).

[138] *Reed*, 556 Fed. App'x at 427 (quoting *Alexander*, 567 F.3d at 558). *C.f.*, *Auto Indus. Supplier Employee Stock Ownership Plan v. Ford Motor Co.*, 435 Fed. App'x 430, 458 (6th Cir. 2011) (rejecting the plaintiff's argument that it "would provide more witnesses at trial to present foundational testimony. As the district court pointed out, this statement shows that SNAPP implicitly conceded that it had failed to provide an adequate foundation for the Frazee report.")

[139] *See Gregg v. Ohio Dep't of Youth Servs.*, 661 F. Supp. 2d 842, 853 (S.D. Ohio 2009).

omitted).[140]

Although Plaintiff has attempted to explain and interpret the attendance records of her fellow employees,[141] she has provided little or no context for the records, and her speculation as to what the records might mean is not sufficient to show pretext.

As for Plaintiff's claim that she was terminated because of her disability in violation of the ADA, at the prima facie stage, the plaintiff's burden is to show that (1) she is disabled but (2) otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) either the position remained open; she was replaced by a non-disabled person; or similarly-situated non-disabled employees were treated more favorably.[142]  In the present case, as explained above, Plaintiff was not qualified for her position because she could not perform an essential function, i.e., attendance and punctuality. Therefore, she has not established a prima facie case of discrimination.  However, as with her retaliation claim, even if she has established a prima facie case, Defendant has presented excessive absenteeism and job abandonment as legitimate, non-discriminatory reasons for her termination, and Plaintiff cannot show that the reasons were pretextual.

"When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'"[143]  The "key inquiry ... is

---

[140] *Gunn v. Senior Servs. of N. Kentucky*, 632 Fed. App'x 839, 848 (6th Cir. 2015).

[141] (Pl's Resp. to SOF, ¶ 10, ECF No. 47.)

[142] *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011); *Stanciel v. Donahoe*, 570 Fed. App'x 578, 581 (6th Cir. 2014).

[143] *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009)).

'whether the employer made a reasonably informed and considered decision before taking' the complained-of action."[144]  Although the employer must point to particularized facts on which it reasonably relied, the Sixth Circuit does "not require that the decisional process used by the employer be optimal or that it left no stone unturned."[145]

Here, Defendant has pointed to particularized facts on which it could reasonably rely to terminate Plaintiff.  Even if Plaintiff only meant to discuss her request for a reasonable accommodation and not refuse to return to work on June 30, Defendant reasonably relied on her statement that she could not return to her job when it terminated her.  Plaintiff has not pointed to any non-speculative evidence from which a jury could reasonably doubt Defendant's explanation.  The facts are undisputed that Plaintiff's job was terminated for her having excessive attendance points in violation of Defendant's Attendance Guidelines and for failure to return to work as directed.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation and discrimination claims.

Because Defendant has presented undisputed material facts showing that it is entitled to judgment as a matter of law on all of Plaintiff's claims, Defendant's motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: June 6, 2016.

---

[144]  *Id.* (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007)).

[145]  *Id.*; *Michael*, 496 F.3d at 599.